# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 23 CR 98 |
| | ) | |
| CHARLIE LEWIS III, | ) | Judge Virginia M. Kendall |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM OPINION & ORDER

The Government charges Defendant Charle Lewis III with possession of controlled substances with intent to distribute (Count I), possession of firearms in furtherance of a drug trafficking crime (Count II), and felon in possession of a firearm (Count III). (Dkt. 2). Pending before the Court are Lewis III's Motion to Suppress, (Dkt. 96), and Second Motion to Suppress, (Dkt. 104). In both Motions to Suppress, Lewis III asks the Court to exclude the evidence collected through the execution of state search warrants 3AN-23-02579SW ("the Wandering Drive search warrant") and 3AN-23-03623SW ("the East 12th Avenue search warrant"). (Dkt. 96 at 1; Dkt. 104 at 1). The second Motion both expands on the arguments in the first Motion and puts forth a request for an evidentiary hearing. For the reasons below, the Court denies both of Lewis III's Motions to Suppress in full [96, 104].

## BACKGROUND

The anonymous tips that would eventually lead to Lewis III's arrest began in April 2023. The Tipster contacted the Anchorage Crime Stoppers organization on April 18, again on May 22, and then with increasing frequency beginning June 13. (Govt. Exhibit 1, Dkt 100-1 (sealed); Def. Exhibit 1, Dkt. 98-1 (sealed)). The Tipster's contacts continued through September 2023. (Govt.

Exhibit 1, Dkt 100-1 (sealed); Def. Exhibit 2, Dkt. 98-2 (sealed)). The application and affidavit supporting the search warrant came from Alaska ATF Officer R. Allen Adair. (*Id.*)

## I.  State Search Warrant 3AN-23-02579SW for Wandering Drive Apartment

### A.  Search Warrant Application

In the first contact, the Tipster provided the 5436 Wandering Drive address in Anchorage, suggesting that "the front four apartments are all involved" in various drug deals. (Dkt. 98-1 at 11 (sealed)).[1] As described in the affidavit supporting the warrant, and verified in the provided Anchorage Crime Stoppers documentation, the Tipster described four individuals involved in the deals, and named Charlie Lewis III as the "Boss" of the operation. (*Id.*) Specifically, the Tipster said that Lewis III sold "cocaine, crack cocaine, crystal meth, heroin[], fentanyl pills, pain pills, and k2 spray;" that a Bryan Wilson sold those same drugs on behalf of Lewis III; that Charlie Lewis Jr. (Lewis III's father) also sold drugs "to support his fentanyl addiction;" and that a man nicknamed "Brick" sold crack cocaine. (*Id.*) The Tipster also provided physical descriptions and phone numbers for the men, and identified Lewis III and Wilson as on federal probation. (*Id.*)

On May 22, the Tipster provided additional information about Lewis III. The Tipster said that Lewis was "switching out" a white Chevrolet truck—with a "KBW 172" tag number containing a large water tank and "some stolen items" in the bed—for a black Mercedes Benz ML500 "JXS 996" tags. (*Id.* at 11–12). The "switching" allegedly facilitated the appearance of running a mobile detailing business. (*Id.*) The Tipster provided a photo—itself included in the affidavit—that identified both the white truck as well as a "goldfish color" Subaru, which Lewis III allegedly had Wilson using to deliver drugs for him. (*Id.*) The Tipster additionally stated that

---

[1] The following information comes entirely from the search warrant affidavit as detailed in the defense's exhibits unless otherwise indicated. This analysis does not consider the aspects of the government's exhibits that include information from Anchorage Crime Stoppers tips that were not within the four corners of the affidavits.

Lewis III had a white woman with a lip piercing named Ashley, herself a drug addict, running drugs for him. (*Id.*) Officer Adair verified the entry door for Unit #2 at 5436 Wandering Drive as the same door visible in the Tipster's provided photo of the two vehicles. (*Id.*)

On June 13, the Tipster reached out with additional information regarding updates to the white Chevrolet truck, upon which Lewis III had allegedly added stickers and business decals, and a new white Kia with "JSK 554" tags. (*Id.* at 12). The Tipster stated that they had seen large quantities of fentanyl because Lewis had just done a "reup," and that Lewis III was in possession of a gun. The Tipster named Lewis III's probation officer as Paula McCormick[2] and provided a phone number. (*Id.*) The Tipster said that Lewis III lies to Officer McCormick, not informing her about the Wandering Drive address and instead telling her that he lives with his wife. (*Id.* at 13).

On June 16, the Tipster provided a photo of crack cocaine, fentanyl, and related paraphernalia and noted that Lewis III had recently "been talking about" one of his crystal meth customers, a white woman in her 50s, who had been "caught with it." (*Id.*) The Tipster said that the photo was taken inside Unit #2 at 5436 Wandering Drive. (*Id.*) On June 17, the Tipster provided a photo of Lewis III seated on a sofa with flooring that Officer Adair identified as matching that in the June 16 photo. (*Id.*) Officer Adair noted that the same "illicit items" from the June 16 photo are visible next to Lewis III in the June 17 photo, and Lewis III can be seen wearing purple latex gloves while huddling over "a clear sandwich bag containing several blue pills" with more pills on a paper plate nearby. (*Id.*) Unlike the first image of the cars, neither of these two photos was included in the affidavit, but Officer Adair described the tips and images in detail.

---

[2] Officer Adair confirmed in his affidavit that Lewis III's assigned probation officer was "Paula Rydberg (aka: McCormick)." (Dkt. 98-1 at 14). The two affidavits switch between "PO Rydberg" and "Officer McCormick" interchangeably. For clarity, this Court will use only "Officer McCormick."

The final Tipster contact identified in the affidavit for the 3AN-23-02579SW warrant came on June 19. The Tipster named Evelyn Laura Sizemore as the white woman in her 50s whose arrest Lewis III had been discussing, and provided her case number from Alaskan court records. (*Id.*)

In his affidavit, Officer Adair identifies himself as "very familiar" with Lewis III "from prior drug and firearm investigations conducted in 2011, 2013, and 2015." (*Id.*) He attests to knowledge that Lewis III was on probation at the time of the aforementioned events.

On June 22, Officer Adair made two contacts: first, he confirmed with Officer McCormick that Lewis III had never reported an association with a Wandering Drive address. (*Id.*) Officer Adair noted that it is common practice for re-offenders on probation to maintain a "sterile residence" while secretly running illicit activities out of an unreported residence. (*Id.*) Officer Adair also spoke with Jeffrey Briley, the landlord for 5436 Wandering Drive, who confirmed that Lewis III rented Unit #2 and had been one of Briley's tenants for four years. (*Id.*) Briley identified the names and apartment numbers of each of the four men that Tipster referenced, including identifying "Brick" as Joseph Arnold Stewart. (*Id.*) Officer Adair gave Briley two of Tipster's images: the one purporting to show Lewis III's cars and the one purporting to show Lewis III handling drugs inside his apartment. Briley confirmed that the photos were taken outside and inside of Unit #2, respectively. (*Id.*)

The next day, Officer Adair drove by 5436 Wandering Drive and observed "a majority of the same vehicles" the Tipster had identified outside, including a white Chevrolet truck registered to Lewis III parked outside Unit #2. (*Id.* at 15). Officer Adair also noted that the truck possessed the business decals that the Tipster described, and observed a number of security cameras outside Unit #2 as well as the adjoining apartments. (*Id.*)

4

Officer Adair proceeded to do a criminal history inquiry for Briley and found two Alaskan misdemeanor convictions in May 1995 and August 1998, as well as 1995 and 1996 arrests in California, but nothing from more recent decades. (*Id.*) Further, on June 24, Officer Adair found photos on Lewis III's Facebook account that corroborated the Tipster's details. He included two such photos in his affidavit. (*Id.* at 14). One photo shows Lewis III with a wad of cash in his pocket with a nearby box of latex gloves "similar to those he wore" in the Tipster's photo. (*Id.* at 15). Officer Adair identified this photo as from the "exact same location" as the Tipster's images. Officer Adair also noted that an Ashley Marlena Siefke posted a photo advertising the details of the mobile detailing truck, including the new stickers that Tipster had referenced in the June 13 report. (*Id.*) Officer Adair speculated that this Ashley was the same Ashley that Tipster alleged ran drugs for Lewis III. (*Id.*) While Officer Adair attempted to communicate with and/or identify Tipster, he received no response as of June 24. (*Id.*)

Officer Adair filed his affidavit and received a search warrant for Unit #2 at 5436 Wandering Drive on June 26, 2023. (*Id.* at 3, 16).

Additional informative events—including Officer Adair's first direct contact with the Tipster—unfolded between June 26 and the search warrant's execution on July 3. These events are detailed in the affidavit for the second search warrant and thus will be discussed below. Nonetheless, it is notable context[3] that in the immediate couple hours after Officer Adair filed for the search warrant, he received two phone calls. First, Officer McCormick informed Officer Adair that she had received a call from Lewis III letting her know that he was moving out of his reported address at 7740 Boundary Unit #2C due to an altercation with his wife. (Dkt. 98-2 at 14 (sealed)). There was no mention of the Wandering Drive address. Second, the Tipster called Officer Adair

---

[3] The Second Motion to Suppress suggests that these events undermine the validity of the first search warrant, an argument addressed in full later in this Opinion.

directly (and for the first time) to share that Briley had informed Lewis III of the investigation after the June 22 conversation.[4] (*Id.* at 15). The Tipster said that Lewis III told Tipster directly that Briley had shown Lewis III the images Officer Adair provided Briley with. (*Id.*) Officer Adair swore in the affidavit that he had not shared the image with anyone beyond Briley. (*Id.*)

### B.  Evidence Obtained

The search warrant for 5436 Wandering Drive was executed in the afternoon of July 6. (*Id.* at 18). Lewis III was not present, but Officer Adair noted that the interior "exactly matched" the Tipster's photograph of Lewis. (*Id.*) Officers did not locate any firearms, currency, or bulk controlled substances on site, but did find drug residue, baggies, a scale, latex gloves, ammunition, an apparent surveillance system monitor, and baking soda, which Officer Adair noted is commonly used to convert cocaine hydrochloride to crack cocaine. (*Id*. at 18–19). Additionally, officers found various paperwork bearing Lewis III's name, as well as that of Ashley Siefke, and clothing that law enforcement identified as belonging to both individuals. (*Id.* at 18)

In the affidavit for 3AN-23-03623SW, Officer Adair noted that he did not expect to locate evidence after learning that Briley tipped off Lewis III about the investigation. (*Id.* at 19). He said officers intentionally did not take the observed drug paraphernalia to "provide Lewis III a sense of security." (*Id.*)

## II.     State Search Warrant 3AN-23-03623SW for East 12th Avenue Apartment

Officer Adair's affidavit for the second search warrant incorporated the information provided for the Wandering Drive address, described the findings at Wandering Drive, and detailed extensive additional contact from Tipster. (*Id.*)

---

[4] The Government points out that Briley pled guilty in March 2024 after the State of Alaska charged him with hindering a prosecution. (Dkt. 99 at 3). That information, however, is not relevant to the present Motion to Suppress as it was not available at the time of the search warrant's execution.

### A. Search Warrant Application

In addition to the June 26 phone call described above, Officer Adair began to receive more direct contact from the Tipster. On June 27, the Tipster told Officer Adair that Lewis III had told the Tipster about Lewis III's earlier conversation with Officer McCormick in which Lewis III said he was kicked out of the 7740 Boundary address. (*Id.* at 15). The Tipster said that Lewis III did this so that Officer McCormick would lose legal authority to search 7740 Boundary under the terms of Lewis III's supervision, though the Tipster believed Lewis III was still storing firearms there. (*Id.* at 15–16). The Tipster said that Lewis III's wife, Chlonda Tucker, sold drugs for Lewis III when his probation had previously been revoked for drug use. (*Id.* at 15). The Tipster also stated that Tucker drove the white Kia that the Tipster had described in an earlier tip, though the car was technically registered to Tucker's mother. (*Id.* at 15). Officer Adair confirmed via state data both that Lewis III had previously had his probation revoked, as well as the car's registration to a Gail Tucker at the 7740 Boundary address. (*Id.* at 15–16).

The Tipster also identified two new addresses relevant to the Lewis III investigation. The Tipster alleged that Lewis III stored his drug profits at 5850 Jordan Circle, an address associated with Natasha Kwachka. (*Id.* at 16). Officer Adair corroborated the association, and found Lewis III's white Chevrolet truck registered to the Jordan Circle address, as well as additional vehicles and registrations tying Kwachka and Lewis III together. (*Id.*) Furthermore, the Tipster stated that Lewis would be moving to an address near Debarr Road. (*Id.*) Later that day, Officer McCormick said Lewis III informed her he would be moving to 6222 East 12th Avenue Unit #3, a residence just off Debarr Road; however, Lewis III later told Officer McCormick he was no longer moving to that address and would instead be moving to 5850 Jordan Circle. (*Id.* at 16–17). Nonetheless,

Officer Adair saw Lewis III's vehicle parked outside of the East 12th Avenue unit on the July morning of the search warrant's execution at Wandering Drive. (*Id.* at 18).

Throughout the rest of the summer, Officer Adair continued to receive and corroborate information from Tipster. He conducted periodic surveillance at all three residences and came to the conclusion that Lewis III primarily resided at the East 12th Avenue unit. (*Id.* at 21). He found that Lewis III received five business licenses from the State of Alaska on the same day in May 2022, four of which were associated with the Jordan Circle address and one of which was listed at the Wandering Drive address. (*Id.* at 17). Though the Wandering Drive business did not include a unit number, it was co-owned by Joseph Stewart, who—according to the Tipster and Briley—lived at Wandering Drive Unit #1. (*Id.*) Officer McCormick said that Lewis III had never disclosed the existence of any of the licensed businesses, instead disclosing only the car detailing business, which was not licensed. (*Id.* at 18). Officer Adair observed that in his experience, the large number of businesses suggested a cover-up for illicit activity. (*Id.*)

Officer Adair's affidavit also described a number of other photos that the Tipster provided between July and September, though the affidavit did not attach the images. The Tipster provided Facebook photos of Lewis III inside the senior housing development Chugach Manor and alleged that Lewis III was storing drugs and proceeds there in the apartment of another associate, one Donna Williams. (*Id.* at 19). Officer Adair provided the images to the facility's maintenance supervisor, who confirmed the images appeared to be taken inside Chugach Manor and confirmed that Williams resided in Apartment #C302. (*Id.*)

Another set of photos, including a short video, apparently depicted Lewis III inside the East 12th Avenue unit. Officer Adair matched the interiors depicted in the images to Zillow photographs of Unit #3D at 6222 East 12th Avenue and found them "identical." (*Id.* at 21). Officer

8

Adair said that the photos included Lewis III standing over a white Prada bag; images of the bag's contents which included "multiple packages of illicit controlled substances," blue fentanyl pills, and purple latex gloves; and images of three cellphones, a digital scale, and a large bundle of cash. (*Id.* at 20). The Tipster said that in exchange for 3.5 grams of crack cocaine, Williams took the white Prada bag "full of drugs" from the East 12th Avenue address back to Chugach Manor for safekeeping. (*Id.*)

Officer Adair filed his affidavit and received a search warrant for Unit #3D at 6222 East 12th Avenue on September 20, 2023. (*Id.* at 3, 22).

### B. Evidence Obtained

The search warrant was executed on September 26, 2023. (Dkt. 96 at 9). On site, officers arrested Lewis III and read him his *Miranda* rights. (*Id.* at 9–10). The search resulted in the seizure of three cellular phones (which themselves were later searched pursuant to a subsequent warrant), 7.6 grams of cocaine base, 138 fentanyl tablets, and $1,500. (*Id.* at 10).

## LEGAL STANDARD

### I. The Fourth Amendment's Probable Cause Requirement

The Fourth Amendment's prohibition of unreasonable searches and seizures requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." U.S. Const. amend. IV. Probable cause amounts to a "fair probability that contraband or evidence of a crime will be found in a particular place based on the totality of circumstances." *United States v. King*, 2021 WL 127828 (9th Cir. Jan. 14, 2021) (citing *United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir. 2007).

"[A] warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Franks v. Delaware*, 438 U.S. 154, 165 (1978) (citations omitted); *United States v.*

9

*Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013). "A magistrate's determination of probable cause "should be paid great deference by reviewing courts," which should employ a "totality of the circumstances" analysis using a "commonsense" and not "hypertechnical" approach. *Illinois v. Gates*, 462 U.S. 213, 214, 236 (1983) (citation modified).

## DISCUSSION

In his First Motion to Suppress, Lewis III argues (1) that the Wandering Drive search warrant was not supported by probable cause because the warrant affidavit relied on uncorroborated anonymous tips that were insufficiently predictive and (2) that the East 12th Avenue search warrant was not supported by probable cause because the warrant affidavit relied on evidence illegally obtained through the execution of the Wandering Drive search warrant. (Dkt. 96 at 1). In his Second Motion to Suppress, Lewis III raises new arguments about both warrants, alleging that the warrant affidavits for both the search warrants contained "willful material misrepresentations and omissions" and requests an evidentiary hearing. (Dkt. 104 at 1). The Court discusses each search warrant in turn.

### I. Wandering Drive Search Warrant

#### a. Anonymous Tips

"An anonymous tip, without more, does not constitute probable cause." *United States v. Mendonsa*, 989 F.2d 366, 368 (9th Cir. 1993) (citing *Gates*, 462 U.S. at 227). "Because hearsay from an unknown informant is highly suspect, officers must provide some basis to believe that the tip is true." *United States v. Clark*, 31 F.3d 831, 834 (9th Cir. 1994) (citing *Gates*, 462 U.S. at 241–245); *Gates*, 462 U.S. at 241 ("Our decisions applying the totality-of-the-circumstances analysis outlined above have consistently recognized the value of corroboration of details of an informant's tip by independent police work."). And "[a]lthough hearsay may be used to establish probable

10

cause in some circumstances, an anonymous tip is insufficient to establish probable cause absent independent corroboration through police investigation or some other indication of reliability." *Clark*, 31 F.3d 831 at 834.

Further, "[m]ere confirmation of innocent static details in an anonymous tip does not constitute corroboration." *Id.* at 834–35 (citing *United States v. Mendonsa*, 989 F.2d 366, 369 (9th Cir. 1993)). Instead, the totality of the circumstances analysis with regard to informant tips evaluates factors such as whether an informant is known or anonymous, whether the informant has a track record of reliability, whether the informant's tips provide predictive information about future events, and whether the informant's knowledge is of an individual's intimate affairs or of the type that could be observed by the general public. *United States v. Rowland*, 464 F.3d 899, 907–08 (9th Cir. 2006).

Here, Lewis III argues that the Tipster was unreliable due to their anonymity and lack of proven track record, the lack of clarity regarding the source of their information and photos, and lack of predictive information about future events. (Dkt. 96 at 12–13). The defense suggests that the Ninth Circuit's holding in *United States v. Mendonsa* is dispositive on this point. (*Id.*) In *Mendonsa*, the investigation at issue originated with an anonymous caller alerting authorities to a man and woman selling cocaine from their residence. *United States v. Mendonsa*, 989 F.2d 366, 369 (9th Cir. 1993). The caller described the occupants, the inside of the house, visible drugs and money, the residents' vehicles, and the presence of dogs, and the investigating officer went on to corroborate "only the facts that a man matching the suspect's description lived at the house, that the cars were registered to him, and that there were dogs on the premises." (*Id.*) The Ninth Circuit rejected the finding of probable cause, holding that the "fact that a suspect lives at a particular location or drives a particular car does not provide any indication of criminal activity." (*Id.* at 369,

371) (finding that the good faith exception would have applied but that the evidence should have nonetheless been suppressed due to a statutory violation).

The next year, in *United States v. Clark*, the Ninth Circuit addressed a search warrant largely built on an anonymous tip that Clark was acquainted with a known federal fugitive wanted for cannabis offenses believed to be living in Alaska. *United States v. Clark*, 31 F.3d 831, 835 (9th Cir. 1994). The court noted that this information did not specifically link Clark to criminal activity and was only partially corroborated. (*Id.*) (declining suppression because "the officers' reliance on the search warrant was objectively reasonable").

Nonetheless, the use of an anonymous tip is not a dagger to the heart of an investigation. The Ninth Circuit distinguished *Clark* in *United States v. Huggins*, where an informant had provided a tip to law enforcement that an individual sometimes known as Huggins, who the informant had last spoken to three years prior, was involved in cannabis and LSD production and distribution. *United States v. Huggins*, 299 F.3d 1039, 1041–42 (9th Cir. 2002). The source said that Huggins may have moved from Eugene to Ashland, and that Huggins had a girlfriend named Rhonda at the time of their last conversation. (*Id.*) The officers in that case corroborated an Ashland address—shared with a Rhonda Taylor, who had previously been arrested for cannabis distribution— as well as a prior association in a town near Eugene; they then compared electrical records between the Ashland property and neighboring residences and found a usage rate of about 5-6 times the neighbors—heavy usage that could be consistent with cannabis cultivation. (*Id.*) The court upheld the probable cause finding, noting factual distinctions from *Clark* and noting that the tip, while "not directly implicat[ing] Huggins in ongoing marijuana production" due to being several years old, was bolstered by "the corroboration of other details of the tip (such as Huggins's relationship with Taylor and his move from Veneta to Ashland)" and suggested "that Huggins had

previously been involved in growing marijuana—and that he had done so while involved with Taylor and living on property she owned." (*Id.* at 1045).

Applying these principles, it is true that Officer Adair's corroboration included "innocent facts" such as Lewis III's address, neighbors, and cars. (Dkt. 96 at 13); *see Mendonsa*, 989 F.2d at 369. But Officer Adair also confirmed that Lewis III was not reporting that address to his probation officer despite a requirement to do so, which Officer Adair took as further evidence that illicit activity was taking place inside the Wandering Drive address. *See United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986) ("In the case of drug dealers, evidence is likely to be found where the dealers live."). Officer Adair also verified with Briley, the Wandering Drive landlord, that the photos of Lewis apparently handling illicit drugs had been taken inside Wandering Drive Unit #2. The nondisclosure of the residential address, paired with the landlord's identification of the allegedly incriminating photo taken inside that address, goes beyond mere "innocent facts."

Lewis III contends that these photos could have been taken any time in a "fairly broad window" because Lewis III had leased the property for four years, and thus no evidence suggested "there were currently narcotics being trafficked." (Dkt. 96 at 13, 16). Yet the Ninth Circuit accepted a three-year-stale tip in *Huggins*, and furthermore, authorities independently verified the June 2023 arrest of Sizemore immediately after the Tipster alleged that Lewis III had made that sale, thus suggesting ongoing drug activity. Further, Officer Adair's affidavit detailed his investigation, his training and experience in drug investigations in the Anchorage area, and his previous knowledge of Lewis III's narcotics activity due to earlier drug-related investigations. These facts, taken together, provided the magistrate judge with a substantial basis to authorize the search. *See Huggins*, 299 F.3d; *cf. United States v. Luong*, 470 F.3d 898, 903 (9th Cir. 2006).

13

Lewis III also notes that "photographs can be easily manipulated with the most basic software and there was no information in the affidavit as to whether or not this was the case." (Dkt. 96 at 13). Yet the defense provides no case law suggesting that the law enforcement erred in considering the Tipster's images in their investigation. Without sources to suggest otherwise, this Court need not disturb the magistrate judge's assessment that Officer Adair's efforts to corroborate the photographed cars and images through his own stop-bys, as well as his confirmation of the image's location with the Wandering Drive landlord, contributed to a reliability finding.

### b. Temporal Proximity

The defense next argues that there was no evidence to suggest the Tipster's information was anything but stale. "An affidavit must be based on facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *United States v. Lacy*, 119 F.3d 742, 745–46 (9th Cir. 1997) (quoting *Durham v. United States*, 403 F.2d 190, 193 (9th Cir. 1968) (citations modified)). "Staleness" is not controlled by "the mere lapse of substantial amounts of time" but instead "in light of the particular facts of the case and the nature of the criminal activity and property sought." *Id.* (citing *United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988) and *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993) (citations modified)). In short: there must be "sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." *United States v. Gann*, 732 F.2d 714, 722 (9th Cir. 1984).

Lewis III nods to the out-of-circuit holding in *United States v. Hython* as sufficiently analogous to the present circumstances. (Dkt. 96 at 15). There, the Sixth Circuit noted that it agreed with the district court's finding of staleness where "neither the affidavit nor the warrant specified the date on which the transaction at the defendant's house took place," though the court also took

14

care to note that this was not actually at issue on appeal because the government did not contest the legal conclusion. *United States v. Hython*, 443 F.3d 480, 483–484 (6th Cir. 2006).

Meanwhile, the Government's brief puts forth the argument that the informant's use of the present tense and Officer Adair's ongoing corroboration, as well as the "four minutes between the timestamp on the screen shot [of Sizemore's active court case number] and the[] time of the tip being submitted," as sufficiently active evidence. (Dkt. 99 at 9–10).

Crucially, though, the Tipster alleged present and ongoing drug distribution, including the allegations of the recent "reup," the sale to Sizemore, and the sighting of Lewis III in possession of a gun. All of these indicate the potential for ongoing criminal conduct, the reliability of which was fleshed out in the analysis above. *See Lacy*, 119 F.3d at 746 (noting that the nature of child pornography means collectors "rarely if ever dispose of such material, and store it for long periods in a secure place," and deeming the information "not stale"); *United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988) (long-term nature of cannabis cultivation, and the fact that growers "often keep the equipment at their residences between growing seasons," justified magistrate's reliance on information that was 5.5 months old); *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991) ("One may properly infer that equipment acquired to accomplish the crime and records of the criminal activity will be kept for some period of time.").

### c. Willful Omission

In his second Motion to Suppress, Lewis III argues that the evidence retrieved from the Wandering Drive search should be suppressed because the affidavit contained "misleading omissions," namely, because Officer Adair received reports that Lewis III was leaving the Wandering Drive address between when the warrant was issued and when it was executed. (Dkt. 104 at 7, 9). The defense references a Second Circuit case holding that "the magistrate must be

made aware of any material new or correcting information." *United States v. Marin-Buitrago*, 734 F.2d 889, 894 (2d Cir. 1984) ("The duty to report new or correcting information to the magistrate does not arise unless the information is material to the magistrate's determination of probable cause."); *accord United States v. One Residential Prop. Located at 8750 Duncan Rd., San Diego, CA*, 312 F. App'x 8, 10 (9th Cir. 2008) ("We do not disagree with the general principle stated in *Marin–Buitrago*."). Lewis III highlights the portion of Officer Adair's second affidavit in which he said he no longer expected to locate the exact evidence from Tipster's photographs at the Wandering Drive address due to Briley tipping Lewis III off about the investigation. (Dkt. 98-2 at 19 (sealed)). Nonetheless, the search still unveiled drug residue, baggies, a scale, latex gloves, ammunition, an apparent surveillance system monitor, and baking soda, which Officer Adair noted is commonly used to convert cocaine hydrochloride to crack cocaine. (*Id*. at 18–19).

The defense's contentions fall short. The reports of Lewis III's move do not undermine the relevance of the address to the search; if anything, fleeing the address upon alert of the investigation could fairly be seen as more indicative of criminal activity than not. Further, Lewis III's relocation could have still been in progress when the warrant was executed, and Lewis III gave his probation officer multiple addresses while never disclosing the Wandering Drive address. Thus, the probable cause finding underlying the magistrate's warrant was not impacted by the additional accumulating evidence.

## II.     East 12th Avenue Search Warrant

### a.    Fruit of the Poisonous Tree

The defense next contends that "the warrant for the East 12th Avenue apartment is irreparably tainted by the plainly unconstitutional warrant issued for the Wandering Drive apartment." (Dkt. 98 at 20).  In cases where a court has granted establishment of primary illegality,

courts must then examine whether "the evidence has been discovered 'by exploitation of that illegality' (i.e., the 'fruit' of the tree), or instead 'by means sufficiently distinguishable to be purged of the primary taint.' " *United States v. Orso*, 266 F.3d 1030, 1034 n.2 (9th Cir. 2001), abrogated on another grounds by *Missouri v. Seibert*, 542 U.S. 600 (2004).

As laid out above, however, the Wandering Drive search was constitutional. Further, the affidavit for the East 12th Avenue apartment utilized but largely did not rely on the specific findings at the Wandering Drive apartment. Rather, information from the Tipster between July and September, and the corresponding corroboration, provided the bulk of the documentation underlying the second warrant.

### b. False Statements

In his second Motion to Suppress, Lewis III argues that Officer Adair "materially misrepresented photographic evidence provided by the Tipster" in the East 12th Avenue affidavit. (Dkt. 104 at 10). The Tipster provided a number of photos between July and September that allegedly documented Donna Williams, Williams' apartment at Chugach Manor, Lewis III inside Chugach Manor, Lewis III handling drugs inside the East 12th Avenue apartment, and a white Prada bag full of illicit drugs. (Dkt. 98-2 at 20 (sealed)). Officer Adair described these images and his related corroborations extensively in the affidavit, but did not paste in the photos directly.

Lewis III suggests that Officer Adair misled the court about the nature and significance of the latter two images. (Dkt. 104 at 10). The relevant descriptions from the affidavit are as follows:

> "LEWIS III is standing at a kitchen table in one of the photographs over a white Prada bag. Three cellular telephones, a digital scale, and a large bundle of currency are also depicted. The contents of the Prada bag are also photographed and include multiple packages of illicit controlled substances. Blue tablets resembling fentanyl tablets are visible. A large baseball size bindle is also depicted and knotted at the top. The contents resemble a white or opaque substance consistent with fentanyl, methamphetamine, or cocaine. Two purple latex gloves are also situated at the bottom of the bag. These gloves are consistent with those previously worn by

17

LEWIS III during the prior video provided by "Tipster." "Tipster" identifies the contents of the Prada bag as "blue fentanyl pills, crack, cocaine, crystal meth and fentanyl powder. . . . "Tipster" completes their report by saying, "Donna Williams came and picked up the Prada bag full of drugs and took it to her apartment in Chugach manor at around 6pm.

(Dkt. 98-2 at 20 (sealed)).

The defense takes two issues with the first image, asserting that it is "not evident that the brown-skinned individual in the photo" is Lewis III, and arguing that the "white object below the person in the image . . . could just as easily be Red Robin food packaging" instead of a white Prada bag. (Dkt. 104 at 12). The defense also notes that while Officer Adair distinguished Tipster's report from his own analysis regarding the white Prada bag photo, he did not include the Tipster's description of the kitchen table photo, which was: "The photo of Charlie at the table bagging drugs to put into the Prada bag. Also showing the $10,000 wad of cash on the table." (Dkts 104 at 11; 100-1 at 10 (sealed)). Lewis III concedes that the picture of the white Prada bag contains "substances resembling drugs," but argues that to assume a connection between the two images "crosses the line to misrepresentation." (Dkt. 104 at 12–13).

The photo that the defense describes as showing "a brown-skinned individual, back to the camera" would be more accurately described as a photo taken from about the 5 o'clock angle: the man's whole face is not visible, but a partial side profile (cheek, part of nose and eyes) is. (*Id.* at 11). Further, the man's full height, statute, and build are estimable from the photograph. (*Id.*) It is fair to suggest that a stranger on the street may not be able to confidently match the man in the photo with a headshot of Lewis III in the abstract.

Officer Adair, however, had been investigating Lewis III for months and swore in his affidavit that he was familiar with Lewis III from prior drug investigations. Further, by this point, Officer Adair had had months of contact with Tipster, whose information had helped lead to the Wandering Drive search that unveiled drug residue, ammunition, and drug paraphernalia, and

18

whose information about various individuals and addresses had continuously been corroborated. Tipster, thus, had built a reputation for reliability throughout the investigation.

In an ideal world, Officer Adair would have included these images in his affidavit in addition to merely describing them. Nonetheless, "[t]o prevail on a claim that the police procured a warrant through deception, the party challenging the warrant must show that the affiant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause." *United States v. Ruiz*, 758 F.3d 1144, 1148 (9th Cir. 2014) (citing *Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir.2009)). The contention that Officer Adair lied about his level of certainty that the man in the image is Lewis III does not rise to that standard. There is nothing in the record to suggest that Officer Adair had any doubt that the man in the photo was the man he had been investigating for several months.

The doubt cast on the white bag also does not demonstrate the kind of deliberate false and material assumption necessary to undermine the affidavit. While there is a brown Red Robin takeout bag in the photo in addition to the white bag, the white bag's edges appear to be made of soft material. This is more consistent with a white Prada dust bag than the crinkly type of white packaging commonly used in fast food takeout. Further, the white object clearly has some type of black logo on the outside that appears consistent with the black Prada logo on the secondary image. While the defense did not provide a photo of the type of "Red Robin food packaging" they allege the white bag to be, it would be more consistent with the photographed brown Red Robin takeout bag (which is decorated with red Red Robin logos) if the white bag had a red design rather than a black one. The same reliability analysis as detailed above bolsters Officer Adair's conclusion that this appears to be the same white Prada dust bag as the one in the photo containing a plethora of illicit drugs.

19

More over, the affidavit additionally details sufficient findings—including but not limited to the Wandering Drive findings; the sighting of Lewis III's car at East 12th apartment despite telling Officer McCormick that was not where he lived; additional surveillance at that address; and the "identical" interiors of Tipster's photographs, photos on Lewis III's Facebook, and Zillow images of the address—that the search warrant could stand on its own even if the above was deemed a "misleading omission." *See United States v. Drew*, 259 F. App'x 942, 944 (9th Cir. 2007) (holding that "observations of the drug trafficker and her vehicle at the residence in the days surrounding the drug sales provided a sufficient basis for probable cause"); *United States v. Aispuro*, 660 F. App'x 526, 527–28 (9th Cir. 2016) ("This circuit has recognized that in narcotics cases evidence is likely to be found where the dealers live."); *see also United States v. Fisher*, 56 F.4th 673, 685 (9th Cir. 2022).

## II.    Good Faith Exception to the Exclusionary Rule & *Franks* Hearing

The good faith exception to the exclusionary rule provides that evidence obtained pursuant to a search warrant lacking probable cause will not be suppressed where "the executing agents relied on the warrant in good faith." *United States v. Shi*, 525 F.3d 709, 731 (9th Cir. 2008); *United States v. Leon*, 468 U.S. 897, 922–23 (1984). "Good faith reliance exists if the agents' affidavit establishes 'at least a colorable argument for probable cause,' and the agents relied on the search warrant in an objectively reasonable manner." *Shi*, 525 F.3d at 731 (quoting *United States v. Luong*, 470 F.3d 898, 903 (9th Cir. 2006)).

As demonstrated in the prior analysis, both searches were constitutional. Even so, the good faith exception would apply in the alternative. *See Mendonsa*, 989 F.2d 366 at 371 (finding that the good faith exception would have applied but that the evidence should have nonetheless been suppressed due to a statutory violation); *see Clark*, 31 F.3d at 835 (declining suppression because

"the officers' reliance on the search warrant was objectively reasonable"). Further, Lewis III has not made a sufficient preliminary showing to justify a hearing under *Franks v. Delaware*, 438 U.S. 154, 171 (1978) ("[T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."); *United States v. Kleinman*, 880 F.3d 1020, 1038 (9th Cir. 2017) (noting that a defendant can secure a *Franks* hearing only once he can make "a substantial preliminary showing that . . . the affidavit cannot support a finding of probable cause without the allegedly false information").

**CONCLUSION**

For the reasons above, the Court denies Lewis III's Motion to Suppress [96] and denies Lewis's Second Motion to Suppress [104].

Virginia M. Kendall
United States District Judge

Date: October 27, 2025

21